UNITED STATES BANKRUPTCY COURT
IN THE WESTERN DISTRICT OF MICHIGAN

AGA 969 LLC, a Michigan limited liability company, RANDY GAMMO, JOANNE KALLABAT, and JOSEPH KALLABAT,

Plaintiffs,

v.

DYLAN BORLAND

Defendants.

Case No. 25-03090-jwb

Hon. James W. Boyd

**COMPLAINT TO DETERMINE NON—DISCHARGEABILITY OF CERTAIN DEBTS**

/

PAESANO AKKASHIAN, PC
Brian M. Akkashian (P55544)
Matthew J. Enright (P85951)
7457 Franklin Road, Suite 200
Bloomfield Hills, Michigan 48301
(248) 792-6886
bakkashian@palawyers.com
menright@palawyers.com
*Attorneys for Plaintiffs*

/

**ADVERSARY COMPLAINT TO DETERMINE NON-DISCHARGEABILITY OF CERTAIN DEBTS**

Plaintiffs, AGA 969, LLC, ("AGA"), Randy Gammo ("Gammo"), Joanne Kallabat ("Joanne"), and Joseph Kallabat ("Joseph," and together with AGA, Gammo, and Joanne, Plaintiffs"), by and through their attorneys, Paesano Akkashian, PC, for their Adversary Complaint to Determine Non-Dischargeability of certain debts owed by Adversary Defendant and Chapter 7 Debtor, Dylan Borland ("Borland" or "Defendant") to Plaintiffs and for the denial of Borland's discharge, state as follows:

## PARTIES, JURISDICTION, AND VENUE

1. AGA is a Michigan limited liability company with its principal place of business located in Bloomfield Hills, Michigan.

2. Gammo is an individual who resides in Oakland County, Michigan.

3. Joanne is an individual who resides in Oakland County, Michigan.

4. Joseph is an individual who resides in Oakland County, Michigan.

5. Borland is an individual residing at 8135 Timberwood Trail, Petoskey, Michigan, 49770.

6. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I).

7. This court has jurisdiction over this proceeding pursuant to 28 U.S.C. §157(b)(1) and §1334(a) and (b).

8. Venue is proper in this District pursuant to 28 U.S.C. §1409.

## GENERAL FACTUAL ALLEGATIONS

### *Plaintiffs' Investment with Borland*

9. Plaintiffs are investors in a real estate holding company created for the purpose of purchasing, renovating, and selling a multifamily real estate project located at 220 Northpoint Drive, Houston, Texas 77060 (the "Property").

10. Specifically, Plaintiffs purchased units in Landings at Northpoint LLC ("Landings"), which owned the Property.

11. Plaintiffs were induced to invest in Landings and therefore the Property based on representations made, and information provided by Borland, and other agents of Borland, including Mark Zawaideh.

12. Initially, Plaintiffs learned of Landings through mutual business acquaintances that introduced them to the investment.

13. Plaintiffs learned that Borland, through his real estate company, Borland Group, LLC ("Borland Group"), formed Landings for the purpose of acquiring the Property via a combination of debt and equity based financing through Prudential Affordable Mortgage Company, LLC (the "Loan").

14. Borland and his associates sought investment from individuals such as Plaintiffs to provide equity for the purchase of the Property.

15. Borland solicited Plaintiffs' investments through various means, including email communications, verbal communications, printed materials and recorded videos,

16. In doing so, Borland provided investment advice, acted as a broker-dealer and/or agent of Landings and sold securities to Plaintiffs.

17. In pitching Plaintiffs' investment in Landings, Borland created and circulated a January 18, 2021, email that including among other representations about the investment, a link to a Google Drive Folder containing documents for prospective investors to complete and return to Borland (the "Investor Folder"), and a video prepared by Borland summarizing the documents and discussing the investment (the "Investor Document Video").

18. In this January 18, 2021, email, Borland represented that investors could expect "9-10% or better annual cash on cash for investors and at least a 20% IRR in 5 years or less." January 18, 2021 email, **Exhibit A**.

19. The Investor Folder included Landings' Operating Agreement, a Private Placement Memorandum and Admission Agreement, wire/mail instructions, an investor questionnaire, and a final investor proforma (the "Final Proforma").

20. In the Investor Document Video Borland made multiple representations regarding his real estate portfolio with Borland Group, investment expectations with Landings, and the status of the Final Proforma.

21. In the Investor Document Video, Borland stated, among other things: (1) "our portfolio is still very very healthy. Multi-family continues to be a very strong asset class," (2) per the Final Proforma "we were able to keep investors pretty much what we had promised you," (3) "we're anticipating at least a 20% IRR [Internal Rate of Return] or above on this asset" (4) "Obviously there is a lot of things that are affected by government shutdowns in the current pandemic. Thankfully the assets that we purchased have not been affected, thank goodness, based on our investment strategy," and (5) "the pro forma is final at this point, so that's it locked in stone."

22. The Final Proforma as included in the Investor Folder consisted of a three-page summary of financial information related to Landings and its purchase and ownership of the Property. Of note, the Final Proforma stated the debt service associated with the Property would be static over the first four years, that insurance was considered a "fixed" expense, and that investors could anticipate a 23.4% 5-year IRR. **Exhibit B**, Final Proforma.

23. Borland's representations as related to an anticipated IRR are consistent with those set forth in the Private Placement Memorandum circulated to Plaintiffs and other investors in the Investor Folder which states: "Anticipated 5 year IRR is expected to be above 20%, anticipated annual cash on cash is expected to fall between 8-10%."

24. Based on Borland's representations regarding his experience in multi-family real estate, expected return on investment, and project financing/financial outlook, Plaintiffs invested in Landings.

25. To coordinate purchase of units in Landings as their investment, Plaintiffs coordinated, with Borland's assistance, to wire funds to Landings, in a total amount of $600,000.

26. Though Plaintiffs were unaware of it at the time, Borland received compensation for his promotion of the investment, providing investment advice to Plaintiffs, and selling securities to Plaintiffs and other investors.

27. Borland received this compensation shortly after Landings purchased the Property, as Borland and others associated with his investment group were paid what he later described as a "syndication fee."

28. These "syndication fees" were paid by Landings to several individuals involved in generating the equity investment for Landings. Borland Group, one of many recipients of "syndication fees," received a payment in the amount of $232,980.00.

29. The Landings units Borland sold to Plaintiffs constitute securities pursuant to the Michigan Uniform Securities Act, ("MUSA"), MCL 451.2101 *et seq*.

30. Plaintiffs collectively purchased 600 units in Landings, for a total purchase price of $600,000 based on Defendant's solicitations and representations.

31. However, Borland Group and the other managers of Landings mismanaged the Property, failed to properly assess the risks associated with the Project, and ultimately caused the Project to fail because of the unnecessary and unapproved risks they took in financing the Project.

32. First, while Plaintiffs believed the Loan financing the Property to be a fixed interest rate loan based on the Borland-created Final Proforma, Plaintiffs later learned the Loan was in fact a variable interest rate loan.

33. Plaintiffs only learned of this after Borland reported to investors that the interest rate was increasing, thereby increasing Landings' monthly loan payments.

34. This quickly proved unsustainable, and Landings economic feasibility dropped drastically.

35. Borland misrepresented that the Loan used to finance purchase of the Property had a fixed interest rate when in reality it had a variable interest rate. The variable nature of the Loan's interest rate was not disclosed to investors, and the increase in the variable interest rate during the time that Landings owned the Property was the single greatest factor contributing to failure of the investment.

36. Plaintiffs would never have invested in Landings or the Property if Borland accurately represented that the Loan included a variable interest rate.

37. Second, the Property was also subject to increased insurance costs, beyond that originally anticipated or projected to investors in the Final Proforma.

38. Insurance costs were presented to investors and Plaintiffs as a fixed cost, but this proved to be inaccurate upon insurance costs increasing.

39. Borland misrepresented that insurance costs associated with the Property were fixed in the Final Proforma, when in fact they were subject to dramatic change during the life of the investment.

40. Plaintiffs would never have invested in Landings or the Property if Borland accurately represented what costs were fixed and which costs were not.

41. Third, rental income proved insufficient to service the outstanding debt even at a 95% rent collection rate, demonstrating the Managers' failure to properly vet and assess the investment from the beginning, failure to properly account or plan for contingencies such as insurance and other cost increases and failure to properly manage the asset.

42. Borland and the other managers of Landings proved unable to manage the units on the Property, secure tenants, and stabilize the Property's income.

43. Plaintiffs later learned that at the time Landings purchased the Property, Borland and Borland Group had zero properties in their financial portfolio, rendering statements as to the "health" of his portfolio false and inaccurate.

44. Borland misrepresented his experience and the status of his multi-family real estate portfolio and therefore his ability to manage and stabilize the Property following Plaintiff's investment.

45. Plaintiffs would never have invested in Landings or the Property if Borland accurately represented his level of experience (or lack thereof) that he was presently managing zero multi-family properties at the time the Property was to be acquired.

46. These failures demonstrate that Borland and his agent's representations regarding Landings, the Property, and the investment were not true at the time they were made, Borland knew or should have known they were not true, and such statements were made in bad faith, without intention of performance, were used by Borland as a device to accomplish fraud, i.e., to induce Plaintiffs to invest in Landings and were made by persons possessed of superior knowledge respecting such matters, with a design to deceive and mislead.

47. According to an email from Borland dated October 9, 2023, the lender foreclosed on the Property on October 3, 2023 and was in the process of selling the Property for approximately $14.5 million, despite outstanding debt of approximately $21-22 million.

48. Prior to the foreclosure sale, Borland discussed with investors the possibility of "saving" the Property from foreclosure and as part of that discussion Borland represented that

Defendants would cause Landings to make two months of mortgage payments and that Landings had the financial wherewithal to do so.

49. The payments were not made and the Property was lost at foreclosure auction.

50. As a result, Plaintiffs will not recoup their investment, nor will they realize a return on investment as promised by Borland.

***Plaintiff's State Court Litigation with Borland Regarding the Investment in Landings***

51. In November of 2023, Plaintiffs filed an action in State Court in Oakland County Michigan, captioned AGA 969, LLC, et al. v Mark Zawaideh, et al, Case No. 23-203704-CB(the "Lawsuit"), bringing claims associated with the facts and circumstances outlined above.

52. In the Lawsuit, Plaintiffs sought damages in the amount of $600,000, plus interest, costs, and attorney fees against Borland.

53. The Lawsuit proceeded through discovery and after Plaintiff's claims survived dispositive motions filed by both Borland and other named Defendants, was scheduled for trial on December 1, 2025.

54. On October 30, 2025, Defendant filed a Chapter 7 Bankruptcy Petition.

55. On October 31, 2025, the Lawsuit was stayed pending the conclusion of Borland's bankruptcy proceeding.

56. Though judgment was not yet rendered in the Lawsuit, Borland identified Plaintiffs as creditors in his Chapter 7 Bankruptcy Petition.

57. Plaintiffs are creditors of Borland in the amount of $600,000, plus interest, costs, and attorney fees.

58. Specifically, AGA is a creditor of Borland in the amount of $100,000, plus interest, costs, and attorney fees; Joanne is a creditor of Borland in the amount of $100,000, plus interest,

costs, and attorney fees; Joseph is a creditor of Borland in the amount of $150,000, plus interest, costs, and attorney fees; and Gammo is a creditor of Borland in the amount of $250,000, plus interest, costs, and attorney fees.

**COUNT I – DENIAL OF DISCHARGE UNDER 11 U.S.C. §523(a)(2)**

59. Plaintiffs restate and reallege the foregoing allegations as though fully restated herein.

60. Pursuant to 11 U.S.C. §523(a), a discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) does not discharge an individual debtor from any debt:

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>
> (B) use of a statement in writing—
>
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with intent to deceive.

61. Borland's money debts owed to Plaintiffs were obtained by false pretenses, false representations, and actual fraud.

62. Borland's money debts owed to Plaintiffs account for the damages claimed in the Lawsuit.

63. The damages Plaintiffs claimed in the Lawsuit relate to Borland's sale of units in Landings to Plaintiffs by way of fraud and misrepresentation.

64. As stated in the Lawsuit, and in violation of MCL 451.2509(2), (a) Borland sold securities to Plaintiffs by means of untrue statements of material fact and/or omissions of material

facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, (b) Plaintiffs did not know of Borland's untrue statements and/or omissions, and (c) Borland knew, or should have known, of their untrue statements and/or omissions.

65. Specifically, (a) Borland represented a goal of "9-10% or better annual cash on cash for investors and at least a 20% IRR in 5 years or less," and (b) in the Investor Documents Video, Borland stated, (1) multi-family properties continue to be a strong asset class, "our portfolio is still very very healthy. Multi-family continues to be a very strong asset class," (2) per the final pro forma, "we were able to keep investors pretty much what we had promised you," and (3) "we're anticipating at least a 20% IRR [Internal Rate of Return] or above on this asset" (4) "Obviously there is a lot of things that are affected by government shutdowns in the current pandemic. Thankfully the assets that we purchased have not been affected, thank goodness, based on our investment strategy," and (5) "the pro forma is final at this point, so that's it locked in stone."

66. However, on November 1, 2024, Borland testified at his deposition that at the time he made and circulated the Investor Document Video, (1) Borland Group had no properties in its portfolio as it had sold its three previously owned properties just before the COVID-19 pandemic, (2) that the pro forma circulated to investors on January 18, 2021 was not final as represented and was subject to change up through closing, and (3) that the loan financing Landings' purchase of the Property was subject to a variable-interest rate.

67. Therefore, Borland's representations in the Investor Document Video were false because (1) Borland Group did not have a portfolio, therefore any statements regarding its portfolio's "health" and "the assets" it had purchased being unaffected by COVID-19 were false, (2) investors did not see a return on their profit, therefore statements regarding "what we had

promised you" and "at least a 20% IRR" were false, and (3) the pro forma per Borland remained subject to change through closing, therefore any statements that the pro forma was "final" or "locked in stone" were false.

68. Plaintiffs relied on these false representations as to Borland Group's portfolio history, expected IRR, and data presented in the Final Proforma in deciding to make their investment in Landings.

69. Further, Borland and his agent, Zawaideh testified that the Loan associated with the Property was subject to a variable interest rate, therefore representations in the Final Proforma that the debt service associated with the Property was fixed were also false.

70. The variable interest rate of the Loan was not disclosed in the Final Proforma Operating Agreement for Landings, in the Private Placement Memorandum, or any other pre-investment documents provided to potential investors, including Plaintiffs.

71. The interest rate on the Loan increased from approximately 3% to over 7.5% in the 2.5-year period that Landings owned the Property, crippling the financial performance of the Property.

72. In conjunction with this omission, the Final Proforma provided to investors prior to investment demonstrated payments on the Loan would be interest only for the first several years of the Loan's life and that the annual payment amounts would be identical during the interest only period.

73. This projected payment structure was only possible if the interest rate was fixed, otherwise payments would change as the interest rate changes. Thus, the representations in the Final Proforma that Loan payments would be the same during the interest only period were patently false, because any change in the variable interest rate would change the payment amount.

74. Further, separate, expanded draft versions of the proforma provided prior to the Final Proforma display an interest rate of 3.03% on two separate tabs – a "financing terms" tab and an "amort sched" tabs. There is no indication on either tab, or anywhere else in the expanded pro forma, that the Loan actually carried a variable interest rate.

75. In fact, the "amort sched" tab includes a 30-year amortization schedule for the Loan that is only accurate if the interest rate remains fixed at 3.03% for the life of the Loan.

76. The terms of the Loan were consistently presented to investors at a fixed interest rate, as finalized in the Final Proforma.

77. The information in the Final Proforma constitutes blatant misrepresentations to potential investors regarding the terms of the Loan, which was a critical factor in the investment's performance.

78. Plaintiffs relied on Borland's false representations as to the interest rate of the Loan in deciding to make their investment in Landings.

79. In fact, if Plaintiffs were aware of the Loan carrying a variable interest rate, they never would have invested in Landings.

80. To the extent any of Borland's representations were "forward-looking," they were made in bad faith, without intention of performance and were used by Borland as a device to accomplish the fraud, i.e., to induce Plaintiffs to invest in Landings.

81. To the extent any of Borland's representations were expressions of opinion, such statements were made in bad faith by persons possessed of superior knowledge respecting such matters, with a design to deceive and mislead.

82. The money debts Borland claims as owed to Plaintiffs are money debts obtained by false pretenses, false representation, and actual fraud.

**COUNT II – DENIAL OF DISCHARGE UNDER 11 U.S.C. §523(a)(19)**

83. Plaintiffs restate and reallege the foregoing allegations as though fully restated herein.

84. Pursuant to 11 U.S.C. §523(a), a discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) does not discharge an individual debtor from any debt:

> (19) that -
>
> > (A) is for -
> >
> > > (i) the violation of any of the Federal securities laws (as that term is defined in section 3(a)(47) of the Securities Exchange Act of 1934), any of the State securities laws, or any regulation or order issues under such Federal or State securities laws; or
> > >
> > > (ii) common law fraud, deceit, or manipulation in connection with the purchase of any security; and
> >
> > (B) results, before, on, or after the date on which the petition was filed, from
> >
> > > (i) any judgment, order, consent order, or decree entered in any Federal or State judicial or administrative proceeding;
> > >
> > > (ii) any settlement agreement entered into by the debtor; or
> > >
> > > (iii) any court or administrative order for any damages, find, penalty, citation, restitutionary payment, disgorgement payment, attorney fee, cost, or other payment owed by the debtor; o

85. Borland's claimed money debts owed to Plaintiffs are debts arising from Plaintiffs asserting Borland's individual liability for his violation of Michigan's securities laws in the Lawsuit.

86. The damages Plaintiffs claimed in the Lawsuit relate to Borland's sale of units in Landings to Plaintiffs by way of fraud and misrepresentation.

87. As stated in the Lawsuit, and in violation of MCL 451.2509(2), (a) Borland sold securities to Plaintiffs by means of untrue statements of material fact and/or omissions of material

facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, (b) Plaintiffs did not know of Borland's untrue statements and/or omissions, and (c) Borland knew, or should have known, of their untrue statements and/or omissions.

88. Specifically, (a) Borland represented a goal of "9-10% or better annual cash on cash for investors and at least a 20% IRR in 5 years or less," and (b) in the Investor Documents Video, Borland stated, (1) multi-family properties continue to be a strong asset class, "our portfolio is still very very healthy. Multi-family continues to be a very strong asset class," (2) per the final pro forma, "we were able to keep investors pretty much what we had promised you," and (3) "we're anticipating at least a 20% IRR [Internal Rate of Return] or above on this asset" (4) "Obviously there is a lot of things that are affected by government shutdowns in the current pandemic. Thankfully the assets that we purchased have not been affected, thank goodness, based on our investment strategy," and (5) "the pro forma is final at this point, so that's it locked in stone."

89. However, on November 1, 2024, Borland testified at his deposition that at the time he made and circulated the Investor Document Video, (1) Borland Group had no properties in its portfolio as it had sold its three previously owned properties just before the COVID-19 pandemic, (2) that the pro forma circulated to investors on January 18, 2021 was not final as represented and was subject to change up through closing, and (3) that the loan financing Landings' purchase of the Property was subject to a variable-interest rate.

90. Therefore, Borland's representations in the Investor Document Video were false because (1) Borland Group did not have a portfolio, therefore any statements regarding its portfolio's "health" and "the assets" it had purchased being unaffected by COVID-19 were false, (2) investors did not see a return on their profit, therefore statements regarding "what we had

promised you" and "at least a 20% IRR" were false, and (3) the pro forma per Borland remained subject to change through closing, therefore any statements that the pro forma was "final" or "locked in stone" were false.

91. Plaintiffs relied on these false representations as to Borland Group's portfolio history, expected IRR, and data presented in the Final Proforma in deciding to make their investment in Landings.

92. Further, Borland and his agent, Zawaideh testified that the Loan associated with the Property was subject to a variable interest rate, therefore representations in the Final Proforma that the debt service associated with the Property was fixed were also false.

93. The variable interest rate of the Loan was not disclosed in the Final Proforma Operating Agreement for Landings, in the Private Placement Memorandum, or any other pre-investment documents provided to potential investors, including Plaintiffs.

94. The interest rate on the Loan increased from approximately 3% to over 7.5% in the 2.5-year period that Landings owned the Property, crippling the financial performance of the Property.

95. In conjunction with this omission, the Final Proforma provided to investors prior to investment demonstrated payments on the Loan would be interest only for the first several years of the Loan's life and that the annual payment amounts would be identical during the interest only period.

96. This projected payment structure was only possible if the interest rate was fixed, otherwise payments would change as the interest rate changes. Thus, the representations in the Final Proforma that Loan payments would be the same during the interest only period were patently false, because any change in the variable interest rate would change the payment amount.

97. Further, separate, expanded draft versions of the proforma provided prior to the Final Proforma display an interest rate of 3.03% on two separate tabs – a "financing terms" tab and an "amort sched" tabs. There is no indication on either tab, or anywhere else in the expanded pro forma, that the Loan actually carried a variable interest rate.

98. In fact, the "amort sched" tab includes a 30-year amortization schedule for the Loan that is only accurate if the interest rate remains fixed at 3.03% for the life of the Loan.

99. The terms of the Loan were consistently presented to investors at a fixed interest rate, as finalized in the Final Proforma.

100. The information in the Final Proforma constitutes blatant misrepresentations to potential investors regarding the terms of the Loan, which was a critical factor in the investment's performance.

101. Plaintiffs relied on Borland's false representations as to the interest rate of the Loan in deciding to make their investment in Landings.

102. In fact, if Plaintiffs were aware of the Loan carrying a variable interest rate, they never would have invested in Landings.

103. To the extent any of Borland's representations were "forward-looking," they were made in bad faith, without intention of performance and were used by Borland as a device to accomplish the fraud, i.e., to induce Plaintiffs to invest in Landings.

104. To the extent any of Borland's representations were expressions of opinion, such statements were made in bad faith by persons possessed of superior knowledge respecting such matters, with a design to deceive and mislead.

105. The debts Borland claims as owed to Plaintiffs are debts associated with Borland's individual liability to Plaintiffs as alleged in the Lawsuit related to his violation of Michigan's

securities laws and/or common law fraud, deceit, or manipulation in connection with the sale of securities.

106. Borland's attempt to have these debts discharged is an attempt to impermissibly seek the discharge of debt associated with his violation of Michigan's securities laws and/or his common law fraud, deceit, or manipulation in connection with the sale of securities to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request that this Honorable Court deny Borland's discharge pursuant to 11 U.S.C. § 523(a)(19).

Respectfully submitted:

PAESANO AKKASHIAN, PC

By: _/s/ Matthew J. Enright_
Brian M. Akkashian (P55544)
Matthew J. Enright (P85951)
Attorneys for Plaintiffs
7457 Franklin Road, Suite 200
Bloomfield Hills, Michigan 48301
(248) 792-6886
bakkashian@palawyers.com
menright@palawyers.com

Dated: January 23, 2026

# EXHIBIT A

BORLAND GROUP

**Dylan <dylan@shenpropertiesllc.com>**

---

## Investor Documents Ready TX Investment

1 message

---

**Dylan Borland** <dylan@borlandcapital.com> Mon, Jan 18, 2021 at 12:35 PM
Cc: India Ward <India@theborlandgroupllc.com>
Bcc: Victor Simon <Fsimon@islandlanecapital.com>, Gil Gonzalez <gil@borlandcapital.com>, Matt Anderson <bfconstruct@yahoo.com>, India Ward <India@theborlandgroupllc.com>, Andrew Brough <andrew@borlandcapital.com>, David Frank <df@peqvc.com>, MARK Zawaideh <Markz@soldbymarkz.com>, Josh Smilowitz <joshua.smilowitz@gmail.com>, Marv Hawbaker <pragma411@gmail.com>, chris moshier <cmoshier45@gmail.com>, ** Rob Stagg <rstagg1@sbcglobal.net>, Matthew Stoffer <mstoffer544@icloud.com>, Matthew Aneese <matthewaneese@gmail.com>, Andrew Aneese <aaneese@gmail.com>, Mark Zaki <zaki22@gmail.com>, Jay Roney <jayroney64@gmail.com>, Josh Smith <josh@ssenterpriseoftroy.com>, Pierre Elia <pelia1023@gmail.com>

Just wanted to shoot everyone an update on the North point Investment, As many of you know we concluded due diligence and placed deposits on funding. At this point the numbers for the deal are pretty dialed in including all closing costs. We had mentioned earlier if there was any big deviation from the numbers we would let investors know, there was not numbers look pretty good in fact the numbers improved in most areas.

As mentioned our overall goal is 9-10%+ annual cash on cash for investors and at least a 20%+ IRR in 5 years or less. The updated final version of the proforma is included in the folder here .

With that said its time to start reviewing investor documents and collecting equity as we push towards a close.

**Here is a link to all all 6 documents you will need to review/sign and send back.** Please start with document (1) the checklist .

https://drive.google.com/drive/folders/1ciM8i9FY6P_rzFWDUVCeq4V-Gal_i3FP?usp=sharing

I know there are many new investors who have not invested with us in the past so I put together a quick video going over the documents and expectations from here if you wish to review.

**Video >** https://vimeo.com/dylansborland/review/501563917/79092d6f0f

Between now and closing it will really be just collecting these documents and capital from each investor as timely as possible. Its imperative that each investor review and send capital in as timely as possible as the seller will not grant extensions on this closing, we just ask you be mindful of that. We have 45-60 days to close from Jan 20th. Most investors typically take a week to review documents then send documents and funds in right after. We understand some of you might also have additional processes with 401ks, IRAs and 1031 requirements that we will have to work through please start those now.

IMPORANT : Many of you naturally will have questions about the process from here whether you have invested in the past or not , where to send funds and how, questions on documents , questions on distributions, questions on tax's , questions on what if ultimately don't close for some reason, etc. we strongly recommend you review the video overview as it will answer many of these as well as the documents themselves.

Of course our team is here for anything each of you may need.

My assistant India will play a big role in helping me with document collection and capital collection so you may her from her often as well as we prepare to close. I have cc'ed her email on this chain.

We are grateful for each of you and ready to get to work on your behalf!

As the checklist will state please do not send wires without confirming directly with myself or India the account numbers., you can also send certified checks as the documents will mention.

Dylan Borland
**Borland Capital Partners**

Focused on wealth preservation through real estate
Committed to extraordinary

**www.BorlandCapital.com**

**Get to know me better by visiting my social sites...**
**Linked In - YouTube - Investing Blog - Facebook**

**Invest with Borland Capital Learn more**
**Open to accredited investors only*

**Dylan Borland is a licensed Associate Broker with Borland Realty LLC*

*CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.*

# EXHIBIT B

## Confidential - Do Not Share,Copy without Written Consent

*Input peach shaded area

Copyright 2020 Life By Design Studios LLC All Rights Reserved. www.theuric.

| | Current T12 | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income (Annual Growth)** | | | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| Vacancy Factor | | 7% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% | 6% |
| Gross Scheduled Income | $ 3,462,796 | $ 3,305,520 | $ 3,460,846 | $ 3,620,831 | $ 3,729,456 | $ 3,841,340 | $ 3,956,580 | $ 4,075,277 | $ 4,197,535 | $ 4,323,462 | $ 4,453,165 |
| Plus: Premium on Planned Improvements | | $ 56,160 | $ 56,160 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Less: Gain/(Loss) to lease | $ (248,864) | $ (33,055) | $ (34,047) | $ (35,068) | $ (36,120) | $ (37,204) | $ (38,320) | $ (39,470) | $ (40,654) | $ (41,873) | $ (43,130) |
| **Gross Potential Income** | **$ 3,213,932** | **$ 3,328,625** | **$ 3,482,959** | **$ 3,585,763** | **$ 3,693,336** | **$ 3,804,136** | **$ 3,918,260** | **$ 4,035,808** | **$ 4,156,882** | **$ 4,281,588** | **$ 4,410,036** |
| Less Vacancy | $ (246,070) | $ (233,004) | $ (208,978) | $ (215,146) | $ (221,600) | $ (228,248) | $ (235,096) | $ (242,148) | $ (249,413) | $ (256,895) | $ (264,602) |
| Less: Non Revenue Units | $ (859) | $ (12,480) | $ (12,854) | $ (13,240) | $ (13,637) | $ (14,046) | $ (14,468) | $ (14,902) | $ (15,349) | $ (15,809) | $ (16,284) |
| Less: Concessions | $ (62,313) | $ (16,528) | $ (17,023) | $ (17,534) | $ (18,060) | $ (18,602) | $ (19,160) | $ (19,735) | $ (20,327) | $ (20,937) | $ (21,565) |
| **Total Rental Income** | **$ 2,904,690** | **$ 3,066,613** | **$ 3,244,103** | **$ 3,339,843** | **$ 3,440,038** | **$ 3,543,239** | **$ 3,649,536** | **$ 3,759,022** | **$ 3,871,793** | **$ 3,987,947** | **$ 4,107,585** |
| Plus: Other Income | $ 149,845 | $ 149,845 | $ 154,341 | $ 158,971 | $ 163,740 | $ 168,652 | $ 173,712 | $ 178,923 | $ 184,291 | $ 189,819 | $ 195,514 |
| Plus: Utility Income | $ - | $ 149,760 | $ 154,253 | $ 158,880 | $ 163,647 | $ 168,556 | $ 173,613 | $ 178,821 | $ 184,186 | $ 189,711 | $ 195,403 |
| Plus: Parking Income | $ 16,590 | $ 73,590 | $ 75,798 | $ 78,072 | $ 80,414 | $ 82,827 | $ 85,311 | $ 87,871 | $ 90,507 | $ 93,222 | $ 96,019 |
| **Effective Gross Income** | **$ 3,071,126** | **$ 3,439,809** | **$ 3,628,495** | **$ 3,735,766** | **$ 3,847,839** | **$ 3,963,274** | **$ 4,082,172** | **$ 4,204,638** | **$ 4,330,777** | **$ 4,460,700** | **$ 4,594,521** |
| **Operating Expenses (Annual Growth)** | | | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| **VARIABLE** | | | | | | | | | | | |
| SALARY EXPENSES | $ 354,427 | $ 330,000 | $ 339,900 | $ 350,097 | $ 360,600 | $ 371,418 | $ 382,560 | $ 394,037 | $ 405,858 | $ 418,034 | $ 430,575 |
| ADMINISTRATION | $ 44,751 | $ 30,000 | $ 30,900 | $ 31,827 | $ 32,782 | $ 33,765 | $ 34,778 | $ 35,822 | $ 36,896 | $ 38,003 | $ 39,143 |
| LEASING EXPENSE | $ 102,890 | $ 45,000 | $ 46,350 | $ 47,741 | $ 49,173 | $ 50,648 | $ 52,167 | $ 53,732 | $ 55,344 | $ 57,005 | $ 58,715 |
| UTILITIES | $ 87,761 | $ 223,797 | $ 230,511 | $ 237,427 | $ 244,549 | $ 251,886 | $ 259,442 | $ 267,226 | $ 275,242 | $ 283,500 | $ 292,005 |
| SERVICES EXPENSES | $ 82,367 | $ 75,000 | $ 77,250 | $ 79,568 | $ 81,955 | $ 84,413 | $ 86,946 | $ 89,554 | $ 92,241 | $ 95,008 | $ 97,858 |
| CLEANING & DECORATING | $ 9,599 | $ 9,887 | $ 10,184 | $ 10,489 | $ 10,804 | $ 11,128 | $ 11,462 | $ 11,806 | $ 12,160 | $ 12,525 | $ 12,901 |
| REPAIRS & MAINTENANCE | $ 25,870 | $ 25,000 | $ 25,750 | $ 26,523 | $ 27,318 | $ 28,138 | $ 28,982 | $ 29,851 | $ 30,747 | $ 31,669 | $ 32,619 |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Unit Turn Over | $ - | $ 73,000 | $ 102,577 [1] | $ 105,655 | $ 108,824 | $ - | $ 84,627 | $ 87,166 | $ 89,781 | $ 92,474 | $ 95,248 |
| Capital Reserves | $ - | $ 58,400 | $ 82,062 | $ 84,524 | $ 87,060 | $ - | $ 67,702 | $ 69,733 | $ 71,825 | $ 73,979 | $ 76,199 |
| **FIXED** | | | | | | | | | | | |
| Real Estate Tax | $ 578,523 | $ 680,000 | $ 700,400 | $ 721,412 | $ 743,054 | $ 765,346 | $ 788,306 | $ 811,956 | $ 836,314 | $ 861,404 | $ 887,246 |
| Insurance | $ 166,740 | $ 171,742 [2] | $ 176,895 | $ 182,201 | $ 187,667 | $ 193,297 [3] | $ 199,096 | $ 205,069 | $ 211,221 | $ 217,558 | $ 224,085 |
| Property Mgmt (3%) | $ 126,902 | $ 103,194 | $ 106,290 | $ 109,479 | $ 112,763 | $ 116,146 | $ 119,630 | $ 123,219 | $ 126,916 | $ 130,723 | $ 134,645 |
| Asset Mgmt (0%) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Total Operating Expenses** | **$ 1,579,830** | **$ 1,825,021** | **$ 1,929,069** | **$ 1,986,941** | **$ 2,046,549** | **$ 1,906,185** | **$ 2,115,700** | **$ 2,179,171** | **$ 2,244,546** | **$ 2,311,882** | **$ 2,381,239** |
| | **5.52%** | | | | | | | | | | |
| **Net Operating Income** | **$ 1,491,295** | **$ 1,614,788** | **$ 1,699,426** | **$ 1,748,825** | **$ 1,801,290** | **$ 2,057,089** | **$ 1,966,473** | **$ 2,025,467** | **$ 2,086,231** | **$ 2,148,818** | **$ 2,213,282** |
| Expense to Income Ratio | 51.44% | 53.06% | 53.16% | 53.19% | 53.19% | 48.10% | 51.83% | 51.83% | 51.83% | 51.83% | 51.83% |
| (CA 25-35% CB 35-45% CC 45-60%) | | | | | | | | | | | |

# Confidential - Do Not Share,Copy without Written Consent

*Input peach shaded area

Copyright 2020 Life By Design Studios LLC All Rights Reserved. www.theuric.

| | Current T12 | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | YEAR 6 | YEAR 7 | YEAR 8 | YEAR 9 | YEAR 10 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Valuation (CAP RATE: 5.75%) | $ 25,935,570 | $ 28,083,269 | $ 29,555,231 | $ 30,414,345 | $ 31,326,776 | $ 35,775,455 | $ 34,199,525 | $ 35,225,511 | $ 36,282,277 | $ 37,370,745 | $ 38,491,867 |
| **Financing Expenses** | | | | | | | | | | | |
| Debt Service (4 YEARS I/O) | | $ 558,900 | $ 558,900 | $ 558,900 | $ 558,900 | $ 993,314 | $ 993,314 | $ 993,314 | $ 993,314 | $ 993,314 | $ 993,314 |
| Debt Service Coverage Ratio (>1.2) | | 2.89 | 3.04 | 3.13 | 3.22 | 2.07 | 1.98 | 2.04 | 2.10 | 2.16 | 2.23 |
| Payoff Amount | | $ 20,250,000 | $ 20,250,000 | $ 20,250,000 | $ 20,250,000 | $ 19,810,049 | $ 19,357,800 | $ 18,892,910 | $ 18,415,025 | $ 17,923,783 | $ 17,418,810 |
| **Net Income after Debt Service** | | **$ 1,055,888** | **$ 1,140,526** | **$ 1,189,925** | **$ 1,242,390** | **$ 1,063,775** | **$ 973,159** | **$ 1,032,153** | **$ 1,092,917** | **$ 1,155,504** | **$ 1,219,969** |
| **Investor Overall Returns** | | | | | | | | | | | |
| Investor Cash In | $ 9,194,549.12 | $ 8,697,892.28 | | | | | | | | | |
| Investor Preferred Return | 0.0% | | | | | | | | | | |
| Investor Preferred Return | $ - | | | | | | | | | | |
| Remaining Income to split | | $ 1,055,888 | $ 1,140,526 | $ 1,189,925 | $ 1,242,390 | $ 1,063,775 | $ 973,159 | $ 1,032,153 | $ 1,092,917 | $ 1,155,504 | $ 1,219,969 |
| Investor Split of Waterfall | 83% | $ 876,387 | $ 946,636 | $ 987,638 | $ 1,031,183 | $ 882,933 | $ 807,722 | $ 856,687 | $ 907,121 | $ 959,068 | $ 1,012,574 |
| Manager Split of Waterfall | 17% | $ 179,501 | $ 193,889 | $ 202,287 | $ 211,206 | $ 180,842 | $ 165,437 | $ 175,466 | $ 185,796 | $ 196,436 | $ 207,395 |
| **Investors Cash on Cash** | | **9.53%** | **10.88%** | **11.35%** | **11.86%** | **10.15%** | **9.29%** | **9.85%** | **10.43%** | **11.03%** | **11.64%** |

| | |
|---|---|
| Exit Year | 5 |
| Valuation on exit (CAP RATE: 5.75%) | $ 35,775,455 |
| | |
| Less: Debt Payoff | $ 19,810,049 |
| Rough Net Proceeds | $ 15,965,406 |
| Investor Equity Return | $ 8,697,892 |
| **Net Profit** | **$ 7,267,514** |
| | |
| **Investor Split (83%)** | $ 6,032,037 |
| **Sponsor Split (17%)** | $ 1,235,477 |
| | |
| Total Investor Return (Over all years) | $ 10,756,814 |
| Total Investor COC | 117.0% |
| Investor Return per year | $ 2,151,363 |
| **5 Year IRR** | **23.4%** |

| **Sample Investment** | **$ 100,000** | **Investor Cash on Cash** |
|---|---|---|
| Year 1 | $ 9,532 | 9.53% |
| Year 2 | $ 10,884 | 10.88% |
| Year 3 | $ 11,355 | 11.35% |
| Year 4 | $ 11,856 | 11.86% |
| Year 5 | $ 10,151 | 10.15% |
| | | |
| Profit from refi | $ 65,604 | |
| Ownership percentage in equity | 1.09% | |
| Total earned on cash | $ 116,991 | |
| Total Investment COC | 116.99% | |
| Term IRR | 23.40% | |
| **Total Equity + Profit Returned** | **$ 219,381** | |